**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MARELLI AUTOMOTIVE LIGHTING USA LLC, *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-11034 (CTG)<br><br>(Jointly Administered) |
| OPMOBILITY GESTION; OPMOBILITY SE; OPMOBILITY HOLDING USA, INC.; and OPMOBILITY LIGHTING HOLDING,<br><br>    Plaintiffs,<br><br>v.<br><br>STRATEGIC VALUE PARTNERS, LLC; MARELLI HOLDINGS CO., LTD.; MARELLI CORPORATION; MARELLI NORTH AMERICA, INC.; MARELLI HOLDING USA LLC; MARELLI TENNESSEE USA LLC; MARELLI AUTOMOTIVE LIGHTING USA LLC; and DOE DEFENDANTS 1-20,<br><br>    Defendants. | Adv. Pro. No. 26-_____ (CTG)<br><br>**JURY TRIAL DEMANDED** |

**ADVERSARY COMPLAINT**

Plaintiffs OPmobility Gestion, OPmobility SE, OPmobility Holding USA, Inc., and

OPmobility Lighting Holding (collectively, "OPmobility" or "Plaintiffs"), for their complaint

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.veritaglobal.net/Marelli.  The location of Marelli Automotive Lighting USA LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 26555 Northwestern Highway, Southfield, Michigan 48033.

against the Defendants Marelli Holdings Co., Ltd., Marelli Corporation, Marelli North America, Inc., Marelli Holding USA LLC, Marelli Tennessee USA LLC, and Marelli Automotive Lighting USA LLC (collectively, "Marelli") and Strategic Value Partners, LLC and Doe Defendants 1-20 ("SVP" and, together with Marelli, the "Defendants") allege as follows:

## NATURE OF THE ACTION

1.      This is an action for trade secret misappropriation in violation of the federal Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*), the Delaware Uniform Trade Secrets Act (6 Del. C. § 2001 *et seq.*), tortious interference with contract, and aiding and abetting breach of fiduciary duty.  Plaintiff OPmobility and Defendant Marelli are direct competitors in the global automotive supply industry, particularly with respect to the highly competitive lighting segment.  Defendant SVP leads a group of senior lenders (the "Ad Hoc Group") that holds roughly 50 percent of Marelli's senior debt.

2.      For nearly six years, Laurent Favre served as Chief Executive Officer of OPmobility SE.  In addition, he was appointed to positions such as President, Director, and/or CEO of eleven additional subsidiary or affiliate entities across the OPmobility enterprise; including as President of OPmobility Lighting Holding, and President and Director of OPmobility Holding USA Inc.  Mr. Favre's role allowed him access to OPmobility's most sensitive, valuable, and secret information, which if disclosed to a competitor could cause significant, irreparable harm to OPmobility's commercial interests.  To protect the company, Mr. Favre and OPmobility negotiated a written employment contract (the "Employment Contract") that included (1) a strict confidentiality clause that provides "absolute" protection for confidential information learned in the course of his employment (the "Confidentiality Provision"), and (2) a non-competition

covenant in which he agreed not to work (as an employee, consultant, or otherwise) for any competitor for two years following his departure (the "Non-Competition Provision").

3.      Although Mr. Favre's employment with OPmobility ended on November 6, 2025, Mr. Favre's Employment Contract obligations remain in full force, as does Mr. Favre's continuing fiduciary duty of loyalty, which precludes him from using or disclosing OPmobility confidential information which he learned during his employment—whether for his own purposes or for those of a third party, such as Marelli or SVP.

4.      In February of this year, SVP[2] approached OPmobility to inquire about the possibility of hiring Mr. Favre as the new CEO of Marelli. OPmobility made clear that it objected, that hiring Mr. Favre would jeopardize OPmobility's confidential information and legal rights, and that OPmobility would enforce those rights in United States courts if necessary. It nevertheless appears that SVP proceeded with its retention of Mr. Favre: On April 13, 2026, Marelli announced that it had brought on an interim CEO, while the Ad Hoc Group announced that it intended to hire Mr. Favre as the permanent CEO at the conclusion of that interim tenure. The Ad Hoc Group also announced that Mr. Favre was working closely with the Ad Hoc Group to support Marelli's strategic planning. Marelli's press release restated the Ad Hoc Group's announcement about Mr. Favre.

5.      OPmobility immediately re-lodged its objection to Mr. Favre's retention, making clear to both SVP and Marelli the prohibition on Mr. Favre's employment by or on behalf of a competitor, and its concerns about their potential access to OPmobility's confidential information

---

[2]      Defendant SVP describes itself as a "global investment firm focused on opportunistic credit and private equity opportunities in North America and Europe." Through those investments, SVP has gained "control or significant influence over 18 businesses, which employ over 90,000 employees." *See* Strategic Value Partners, *available at* https://www.svpglobal.com/ (last visited June 15, 2026).

through him.  Both responded that they and Mr. Favre were not in violation, with Marelli stating that it had not offered to employ Mr. Favre and was not employing him.  In recent weeks, however, OPmobility has been informed that Mr. Favre has begun meeting with OPmobility's customers, working with shareholders, and visiting plants on behalf of Marelli.

6.      Both SVP and Marelli are aware that any use of OPmobility's confidential information by Mr. Favre on their behalf violates his contractual obligations and his fiduciary duties, and constitutes a violation of both state and federal trade secret law.  Both SVP and Marelli are further aware that any employment of Mr. Favre by or on behalf of Marelli before November 6, 2027 will both violate his obligations under the Non-Competition Provision and jeopardize OPmobility's confidentiality rights.

7.      OPmobility therefore brings this action to enforce its rights and seeks injunctive relief and damages to remedy both ongoing and threatened future harm.

**INTRODUCTION**

8.      OPmobility traces its origins to 1946, when a young Parisian chemical engineer named Pierre Burelle founded Compagnie Plastic Omnium.  Burelle was driven by a singular vision: that plastics, dismissed as inferior to wood and metal, would transform the automobile industry.  That vision was realized in the rubble of post-war France when, with metal in short supply and the French automobile industry just starting to rebuild, Burelle identified dozens of car components that could be improved—made lighter, more durable, and more efficient—through his innovative use of plastics.  That clarity of vision propelled the company forward, helping it to reshape the automotive industry over the next eight decades.

9.      Although OPmobility is publicly listed on the Euronext Paris stock exchange, the Burelle family has always maintained its close ties.  Pierre Burelle's son, Jean Burelle, took over

4

the role of Chairman and CEO from his father in 1987, serving in that position until 2001. Laurent Burelle then led the company for almost two decades as Chairman and CEO. On January 1, 2020, the company changed its leadership structure: Laurent Burelle became the Chairman of the Board of Directors, a position in which he remains; Mr. Favre joined as the first non-family member to serve as CEO; and Félicie Burelle assumed the position of Managing Director. After Mr. Favre departed OPmobility, Félicie Burelle was appointed CEO, returning the company to family leadership.

10.     In 2024, Plastic Omnium rebranded as OPmobility, reflecting the company's strategic embrace of its broader role as a technology partner for sustainable, software-defined, and connected mobility. The new name captured the company's evolution into an integrated systems provider at the forefront of intelligent exteriors, clean energy systems, vehicle modules, and automotive lighting.

11.     Today, OPmobility is a global Tier 1 automotive supplier, and a worldwide leader in the manufacture and sale of automotive components, including lighting systems, bumpers, body panels, fuel tanks, hydrogen and fuel cell systems, and electronic modules. Approximately one in three vehicles produced globally is equipped by OPmobility. Across the world, OPmobility employs more than 38,000 people in 28 countries, with 152 plants and 40 R&D facilities. OPmobility counts among its major customers Ford, Stellantis, General Motors, Rivian, Volkswagen, and Tesla.

12.     Much of OPmobility's business is focused on the U.S. automotive industry. Within the U.S., OPmobility operates 11 factories and six R&D centers, employing more than 3,300 people. In October 2025, OPmobility inaugurated its new North American headquarters in Troy, Michigan, celebrating five decades of investment, manufacturing, and innovation in the U.S. The

Troy headquarters—opened during Mr. Favre's final weeks with the company—integrates all of OPmobility's complementary business divisions under a single roof: exterior and lighting systems, complex modules, energy storage systems, and battery and hydrogen electrification solutions.

13.    OPmobility's U.S. footprint reflects its strategic commitment to competing for the most valuable and technologically advanced programs in the U.S. market, including the growing electric vehicle sector.  In 2024, OPmobility publicly committed to doubling its U.S. revenues by 2030, with the country already standing as OPmobility's largest revenue contributor.

14.    Between January 1, 2020 and Mr. Favre's departure from the company on November 6, 2025, Mr. Favre sat atop OPmobility's entire worldwide operation, serving as CEO of not just the global parent, OPmobility SE, but a number of other subsidiaries, including the Delaware parent corporation for OPmobility's U.S. operations.  As CEO, Mr. Favre was not just *privy* to OPmobility's strategic plans—he was a decision-maker for all of them.  Mr. Favre oversaw OPmobility's operations, its competitive strategies, its market positioning, its customer relationships, its investments and acquisitions, its expansion plans, and its deployment of capital. Every bid for business, every product development, every factory opening, every merger or acquisition, every geographic expansion, and every dollar of each subsidiary's annual budget sat squarely within his purview.

15.    Particularly relevant with respect to Marelli—one of OPmobility's direct competitors in the cutthroat market for exterior automotive lighting and related systems—Mr. Favre engineered and steered OPmobility's expansion into automative lighting and OPmobility's development of its innovative and market-disrupting lighting products, which it has integrated into its exterior parts business to provide customers with multi-dimensional products with exceptional value.

16. In sum, during his nearly six-year tenure, Mr. Favre was entrusted with the entire company.

17. OPmobility brings this suit to protect against the use and threatened disclosure of its sensitive, proprietary trade secrets and confidential commercial information arising from the Defendants' plan to hire, and ongoing coordination with, Mr. Favre to lead Marelli's lighting operations as Marelli's CEO, and to enforce its contractually-bargained for rights.

18. This is no idle concern. In February 2026, just four months after Mr. Favre left OPmobility's employ, SVP contacted OPmobility to discuss Mr. Favre's potential appointment as Marelli's new CEO. OPmobility immediately informed SVP and Marelli that any such appointment would violate the terms of Mr. Favre's employment contract, including the two-year contractual Non-Competition Provision that Mr. Favre had freely and voluntarily assumed.

19. Despite being fully aware of Mr. Favre's obligations, on April 13, 2026, both Marelli and the Ad Hoc Group, led by SVP, issued press releases announcing that Mr. Favre would be appointed as Marelli's CEO after a period of interim leadership; the Ad Hoc Group in particular noted that Mr. Favre would be working closely with the Group "to support Marelli's ongoing restructuring and strategic planning," even before Mr. Favre formally took over from Marelli's interim CEO.

20. The next day, Marelli responded to OPmobility, stating that it had received no confidential information from Mr. Favre and had no intention to do so, and that neither Marelli nor anyone authorized to act on its behalf "had entered into an employment relationship with Mr. Favre" or had "a present intention to do so."

21.      In subsequent correspondence dated June 3, 2026, Marelli reiterated that position, and sought to further distance itself by noting that the statement of intent to hire Mr. Favre as CEO was made by the Ad Hoc Group.

22.      Upon information and belief, notwithstanding OPmobility's repeated warnings that Mr. Favre had an obligation to protect OPmobility's confidential trade secrets and was bound by the Non-Competition Provision, in or around May of 2026, Mr. Favre began meeting in person with several of OPmobility's customers on behalf of Marelli.  Similarly, on information and belief, around this time Mr. Favre was also present at Marelli's facility in Bari, Italy.

23.      Mr. Favre is in possession of OPmobility's most sensitive trade secrets, including its product, customer, and supplier pricing and expansion plans for the current and upcoming fiscal year—in fact, he made the final decision to approve those plans.  Those strategic plans are the ultimate competitive intelligence: they would inform Marelli of, among other things, which contracts OPmobility intends to bid on, what pricing it can afford to offer, what products it is developing, and where it intends to invest in capital and build production capacity—all at a time when Marelli is seeking to exit bankruptcy and is in need of competitive intelligence to forestall further financial challenges.  Both the state and federal trade secret statutes flatly prohibit the Defendants from procuring and using those confidences. Mr. Favre's contractual obligations and continuing fiduciary duties also preclude the Defendants from doing so. As discussed further below, Mr. Favre's Employment Contract, both through the Non-Competition Provision and the Confidentiality Provision, expressly contemplates that very risk, noting Mr. Favre had access to OPmobility's most sensitive and confidential information and warning of the harm that could befall the company should he fail to comply with his obligations. Indeed, any work that Mr. Favre were to perform for a competitor would benefit from the use of OPmobility's trade secrets, even

8

if he did not directly and explicitly share them with others at the competitor company. Simply put, Mr. Favre is obligated to protect OPmobility's trade secrets, and the Defendants are barred from benefitting from them in any way.

24.     For six years, Mr. Favre was entrusted with a multibillion-dollar global operation, built over eight decades of hard work.  During the period Mr. Favre oversaw OPmobility, the company made a bold and considered move into the cutthroat market of automotive lighting. Having successfully executed on that strategy, Mr. Favre holds the key to many, if not all, of OPmobility's most cherished trade secrets and sensitive business information.

25.     He undertook, and continues to be paid for, an obligation *not* to take OPmobility's confidential, proprietary, and/or trade secret information to a competitor or anyone working with, or on behalf, of a competitor.  OPmobility is entitled to the benefit of that bargain, and to the protections of U.S. federal and Delaware state law which prohibit a competitor from interfering with its rights or receiving its confidential competitive information.  Faced with the danger that it may be irreparably harmed by the Defendants' conduct, OPmobility brings this action to protect its rights, stop the imminent and irreparable harm it faces, and seek the full redress provided by the law:

26.     First, OPmobility seeks to protect its valuable trade secrets and to uncover the truth about the scope of the Defendants' wrongful conduct, which they have taken extensive steps to conceal from OPmobility and the public through intentionally misleading statements.

27.     Second, OPmobility seeks an injunction to block the Defendants from hiring, employing, or retaining Mr. Favre in any capacity during the term of his bargained-for non-competition obligation (until November 2027), and to otherwise protect against the acquisition, elicitation, misappropriation, and/or misuse of OPmobility's trade secrets by its direct competitor,

including those measures necessary to contain and remedy any disclosure that has already been made in violation of Mr. Favre's obligation to maintain confidentiality.

28.     Third, OPmobility seeks damages, including disgorgement of any profits earned by the Defendants or any successor entity through misuse of the trade secrets disclosed by Mr. Favre.

## THE PARTIES

29.     Plaintiff OPmobility SE is a societas Europaea (European public limited company) with its registered office located at 19, Boulevard Jules Carteret, 69007 Lyon, France and its administrative office located at 1, Allée Pierre Burelle, 92593 Levallois Cedex, France.

30.     Plaintiff OPmobility Gestion is a French société en nom collectif (general partnership) with its principal place of business and registered office located at 19, Boulevard Jules Carteret, 69007 Lyon, France.  A subsidiary of OPmobility SE, OPmobility Gestion serves *inter alia* as the OPmobility entity dedicated to handling key administrative and management support functions within the OPmobility ecosystem.

31.     Plaintiff OPmobility Holding USA, Inc. ("OPmobility Delaware") is a Delaware corporation with its principal place of business located at 4685 Investment Dr., Troy, MI, 48098.

32.     Plaintiff OPmobility Lighting Holding is a société par actions simplifiée (simplified joint-stock company) with its registered office located at 19 Boulevard Jules Carteret, 69007 Lyon, France and its administrative office located at 1, Allée Pierre Burelle 92593 Levallois Perret, France.

33.     Upon information and belief, Defendant Marelli Holdings Co., Ltd. is a Japanese kabushiki kaisha (stock corporation) with its principal place of business located at 2-19-4 Miyahara-Cho, Kita-ku Saitama-City 331-0812, Japan.

34.     Upon information and belief, Defendant Marelli Corporation is a Japanese kabushiki kaisha (stock corporation) with its principal place of business located at 2-19-4 Miyahara-Cho, Kita-ku Saitama-City 331-0812 Japan.

35.     Upon information and belief, Defendant Marelli North America, Inc. is a Tennessee corporation with its principal place of business located at 1 Calsonic Way Shelbyville, TN 37160.

36.     Upon information and belief, Defendant Marelli Holding USA LLC is a Michigan limited liability company with its principal place of business located at 26555 Northwestern Highway Southfield, MI 48033.

37.     Upon information and belief, Defendant Marelli Tennessee USA LLC is a Michigan limited liability company with its principal place of business located at 181 Bennett Drive Pulaski, TN 38478.

38.     Upon information and belief, Defendant Marelli Automotive Lighting USA LLC is a Delaware limited liability company with its principal place of business located at 26555 Northwestern Highway Southfield, MI 48033.

39.     Upon information and belief, Defendant Strategic Value Partners, LLC is a Delaware limited liability company with its principal place of business located at 100 West Putnam Avenue, Greenwich, CT 06830.

40.     Upon information and belief, the Doe Defendants 1-20 are affiliates of Defendant SVP that directly or indirectly manage funds or separate accounts with investments in Marelli who, as subsequent discovery may reveal, have participated in, directed, authorized, or aided and abetted the wrongful conduct described herein.  OPmobility will amend this Complaint to state the true names and capacities of the Doe Defendants if and when such information is ascertained.

**JURISDICTION AND VENUE**

41.     If originally filed in the United States District Court for the District of Delaware, the District Court would have subject matter jurisdiction over the claims asserted under the Defend Trade Secrets Act pursuant to 18 U.S.C. § 1836(c) and federal question jurisdiction under 28 U.S.C. § 1331.

42.     The United States District Court for the District of Delaware would have supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the Defend Trade Secrets Act claim that they form part of the same case or controversy.

43.     Venue would be proper in the United States District Court for the District of Delaware under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

44.     This Court and the United States District Court for the District of Delaware have personal jurisdiction over Defendant Marelli Automotive Lighting USA LLC and Defendant Strategic Value Partners, LLC because each is a Delaware limited liability company. Fed. R. Civ. P. 4(k)(1)(A).

45.     This Court and the United States District Court for the District of Delaware have personal jurisdiction over all remaining defendants because they have transacted business in Delaware and caused tortious injury both within and outside of Delaware by acts or omissions both within and outside of Delaware, including the recruitment of Mr. Favre to serve as Marelli's next CEO in connection with Marelli's bankruptcy pending in Delaware. These defendants regularly do or solicit business in Delaware, engage in other persistent courses of conduct in Delaware or

12

derive substantial revenue from services, or things used or consumed Delaware. Fed. R. Civ. P. 4(k)(1)(A); 10 Del. C. § 3104(c).

46.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

47.    Venue in this adversary proceeding is proper before this Court pursuant to 28 U.S.C. § 1409.

48.    The claims asserted in the Complaint are non-core. Pursuant to Local Rule 7008-1, OPmobility does not consent to the entry of final orders or judgment by the Bankruptcy Court.

## FACTUAL BACKGROUND

### A.    *Laurent Favre's Tenure with and Departure from OPmobility*

49.    Laurent Favre joined OPmobility (then Plastic Omnium) as Chief Executive Officer and director of Compagnie Plastic Omnium SE on January 1, 2020.  As noted above, he was the first non-Burelle family member to lead OPmobility.

50.    Mr. Favre served as CEO for nearly six years, overseeing a period of significant strategic transformation that resulted in his complete immersion in every dimension of the group's competitive position, financial structure, technological innovation, customer relationships, and long-term planning.  During that period, Mr. Favre held at least a dozen additional senior executive positions with the various OPmobility entities, (collectively, the "OPmobility Group"), including serving as President of OPmobility Lighting Holding, and President and Director of OPmobility Delaware.

51.    Mr. Favre sat atop every reporting line within the OPmobility Group.  Every business unit, including Lighting, reported directly or indirectly to him.  Every senior executive

13

and officer of OPmobility's business groups reported to him.  Mr. Favre also chaired or served on the OPmobility Group Executive Committee and participated in the selection and promotion of key employees who now sit on the Executive Committee.  Among other things, decisions regarding major bids and pricing, capital allocations, acquisitions and divestitures, technology-roadmap decisions, research and development investments, and senior personnel decisions were all ultimately under his purview.

52.    As CEO, Mr. Favre personally approved or reviewed:

a.   OPmobility's annual budget;

b.   OPmobility's 5-year strategic plan;

c.   Disposal and acquisition projects with a value exceeding €50M or a revenue scope exceeding €100M;

d.   Any hiring or departure of current or future members of the Executive Committee; and

e.   The raising or cancellation of credit facilities and banking agreements.

53.    Given the scope of his knowledge and access across all aspects of OPmobility's business, OPmobility insisted upon Mr. Favre committing to robust protections for its valuable information in his Employment Contract, which he signed on July 10, 2019, approximately six months before he took the reins of the company as CEO.

54.    The Employment Contract included strict confidentiality obligations in the Confidentiality Provision set forth in Article 7, as follows:[3]

> *Mr. Laurent FAVRE undertakes to maintain the strictest discretion and absolute confidentiality regarding all data, information, and documents obtained in the course of his duties or by virtue of his*

---

[3]    Italicized text throughout reflects a court-certified translation from French to English.

*affiliation with the Company and, more broadly, of his positions within the companies of the PLASTIC OMNIUM Group.*

*All documents not intended for public disclosure, regardless of their nature or format, provided by the Company to Mr. Laurent FAVRE are confidential and remain the exclusive property of the Company, to which they must be returned immediately upon request.*

\*\*\*

*Mr. Laurent FAVRE expressly acknowledges that the above obligations are essential and will survive the termination of this contract, regardless of the cause.*

\*\*\*

*Similarly, Mr. Laurent FAVRE is advised that any breach thereof after the termination of this Agreement may give rise to his liability for any damage(s) suffered by the Company or any other entity of the PLASTIC OMNIUM Group.*

55.     The Employment Contract also contained the Non-Competition Provision in Article 8, which recognized the extraordinary scope and depth of Mr. Favre's access to OPmobility's confidential and proprietary trade secrets, and the reasonable and necessary measures required to avoid causing irreparable harm to OPmobility's business:

*Given his responsibilities and his membership on the Executive Committee of the PLASTIC OMNIUM Group, Mr. Laurent FAVRE has access to highly confidential and strategic technical, commercial, industrial, and financial data pertaining to all of the PLASTIC OMNIUM Group's activities and business lines.*

*To protect the legitimate interests of the PLASTIC OMNIUM Group, given the harm that could result from the disclosure of this data and its use by a competitor, the following measures must be implemented.*

56.     The Non-Competition Provision further provides that "regardless of cause," upon the termination of Mr. Favre's Employment Contract, Mr. Favre agreed:

*[N]ot to join a company that manufactures or sells products and/or services that may compete with those of the PLASTIC OMNIUM Group companies, regardless of their status (shareholder, consultant, employee, etc.); and*

15

> *not to have any direct or indirect interest, in any form whatsoever,*
> *in a business of this nature.*

57.     The Non-Competition Provision is limited in scope: it applies only "*to companies manufactur[ing] or sell[ing] products and/or services that may compete with those of the PLASTIC OMNIUM Group companies*" and expires two years from the date the Employment Contract is terminated.  The term of Mr. Favre's non-compete obligation therefore runs through November 6, 2027.  The Non-Competition Provision is also limited to Europe, the United States of America, and China, rather than covering every market in which OPmobility operates.

58.     As a portion of the consideration for the Non-Competition Provision, OPmobility agreed to pay Mr. Favre "*a special monthly allowance equal to 40% of his gross base monthly compensation*" for the duration of the non-competition period.

59.     Mr. Favre owes a fiduciary duty to OPmobility Group and to OPmobility Delaware, a Delaware Corporation, by virtue of his prior roles as OPmobility Delaware's President and Director and as CEO of OPmobility SE.  Under Delaware law, the duty of loyalty includes a duty not to use or communicate OPmobility's confidential information for Mr. Favre's own purposes or for those of a third-party, like Marelli or SVP.  That duty of loyalty is a continuing one and applies to all confidential information obtained by Mr. Favre, whether physically in his possession or retained in his memory.

60.     Although Mr. Favre left OPmobility's employ effective November 6, 2025, his fiduciary obligations survive to the extent they concern his use or disclosure of the confidential information to which he enjoyed access during his tenure.  The Defendants knew that Mr. Favre owed a continuing fiduciary duty of loyalty to OPmobility Group, and specifically to OPmobility Delaware.  They also knew that his work for, or on behalf of, Marelli—a major competitor—would involve the use of the same strategic, commercial, and competitive knowledge he acquired by

16

virtue of his positions with OPmobility Group, including as OPmobility Delaware's President and Director, for his and their benefit and thus would constitute a breach of that duty. Nonetheless, the Defendants knowingly induced and facilitated that breach, by actively recruiting and employing Mr. Favre to serve as Marelli's global CEO.

61. After over five years at the helm of OPmobility, Mr. Favre departed his employment on November 6, 2025.

62. OPmobility has fully complied with all of its obligations under Mr. Favre's Employment Contract, which remains in full effect.

63. To date, OPmobility has paid Mr. Favre €294,666.65 (gross) of the "*special monthly allowance*" as consideration and in anticipation that he would honor the Non-Competition Provision.

**B.** **_Mr. Favre Oversaw OPmobility's Expansion into Automotive Lighting, Supervised Its Market-Disrupting and Innovative Lighting Products, and Was Privy to Its Most-Sensitive Trade Secrets_**

64. During his tenure, Mr. Favre oversaw the rollout of critical strategies across Lighting and other divisions; directed OPmobility's U.S. growth strategy, including a number of critical acquisitions; and managed the development, marketing, and sales of innovative OPmobility products. Mr. Favre also personally led negotiations with OPmobility's customers on major program contracts, including for lighting products.

65. OPmobility's emergence as a global leader in automotive lighting is the product of two carefully sequenced strategic acquisitions, overseen and directed by Mr. Favre, followed by years of intensive integration and proprietary innovation. Together, these investments transformed OPmobility into one of the world's most technically sophisticated automotive lighting suppliers.

66. First, in July of 2022, OPmobility acquired Automotive Lighting Systems ("AMLS"), a specialist in technologically advanced lighting modules. Then just a few months

later, on October 6, 2022, OPmobility completed the acquisition of Varroc Lighting Systems ("VLS"), one of the top ten automotive lighting suppliers worldwide.

67.     The acquisitions of AMLS and VLS enabled OPmobility to launch a new Lighting business.  These acquisitions further enabled Mr. Favre to conduct comprehensive due diligence across all key dimensions of the automotive lighting industry, including financial, market, commercial, and technological aspects.  Mr. Favre also participated in OPmobility's detailed reviews and assessments of other acquisition opportunities in the automotive lighting sector, which gave him deep insight into OPmobility's market assessment.

68.     By combining AMLS's leading-edge electronics, software, and optics expertise with VLS's manufacturing scale, OPmobility positioned itself to develop smart, fully integrated exterior systems for automotive manufacturers, encompassing bumpers, tailgates, body panels, front-end modules, and lighting within a single, unified offering.  In 2025, OPmobility launched the global debut of "One4You"—the result of this years-long effort—at the Consumer Electronics Show in Las Vegas.  "One4You" is OPmobility's groundbreaking, proprietary platform: a modular, all-in-one exterior solution integrating bumpers, body panels, lighting, and software in a single offering.  One4You has transformed the automotive industry.  In the first year of its effective rollout, One4You secured ten awards with several Original Equipment Manufacturers ("OEMs") across all key regions in the world.[4]

69.     OPmobility's foray into lighting, which began during Mr. Favre's tenure, has developed into one of its most strategically important products, keeping it at the forefront of some of the most significant technological developments in the American automotive market.  For

---

[4]     In common parlance, as relevant here, OEMs refer to manufacturers, such as Ford, Stellantis, General Motors, Rivian, Volkswagen, and Tesla.

18

example, in 2024, with Mr. Favre at the helm, OPmobility and Rivian Automotive developed and supplied the very first Adaptive Driving Beam headlamp systems ever to receive approval for use in the U.S.  As another example, in 2023, under Mr. Favre's management, OPmobility developed its innovative Modular Projector Platform, which enables automakers to deploy matrix LED technology across vehicle lines without incurring the custom engineering costs previously associated with such systems—thereby offering a complete, vertically integrated lighting solution spanning optical design, LED driver modules, headlamp control modules with proprietary algorithms, embedded software, mechatronic alignment systems, and body-integrated signal lighting.

70.     The commercial validation of these technologies has been substantial.  In 2025 alone, OPmobility's economic revenue totaled €11.537 billion, with the exterior and lighting segment accounting for €5.312 billion of that amount.

71.     During his time at OPmobility, Mr. Favre had access to the company's most sensitive and valuable commercial, financial, and strategic information, including—but not limited to—the company's strategy and analyses of its expansion into the above technologies.  As the chief executive charged with steering the company, Mr. Favre received information touching on every aspect of the company, including corporate strategy, capital deployment, and customer analysis. That highly confidential information reflected years of development by OPmobility, drawing from the work across multiple business units, requiring considerable expense and investment.  Such information is highly confidential and comprises OPmobility's trade secrets; it includes:

72.     *Corporate Strategy*.  OPmobility conducts ongoing review of its corporate strategy and compiles this information into comprehensive documents provided to senior management, including in connection with a yearly strategy meeting every June (known internally as "Strat-

19

plan") and bi-monthly executive board meetings.  This corporate strategy touches on all aspects of OPmobility's business, including its short- and long-term strategy and 2026-2030 business plan; assessments of its competitive standing and analysis of specific geographic markets; and overall pricing strategy.

73.     ***Customer Information***.  OPmobility compiles information about the OEMs to which it sells its automotive lighting components.  This includes detailed information about nearly every aspect of OPmobility's customer relationships, including the customer-specific technical requirements, commercial terms, delivery and logistics arrangements, quality and warranty performance metrics, and OPmobility's internal assessment of each customer's strategic priority level and relationship development trajectory.

74.     ***Merger, Acquisition, and Joint Venture Information***.  OPmobility maintains significant internal data about its merger and acquisition ("M&A") strategy, including OPmobility's assessment of markets and market competitors, analyses of potential acquisition targets for which OPmobility signs non-disclosure agreements ("NDA"), plans for potential mergers, acquisitions, and joint ventures, term sheets for proposed M&A or joint venture opportunities; for potential deals that have progressed to an advanced stage, this also includes extensive due diligence, research and analysis to prepare management presentations, and significant work in support of contract negotiations.  This includes OPmobility's assessments about whether to expand into certain businesses or geographic markets organically or through mergers, acquisitions, or joint ventures.

75.     ***Pricing Strategy and Structure***.  OPmobility hosts a large amount of pricing-specific data largely aimed at ensuring it secures and maintains a competitive pricing edge in the industry.  This data includes OPmobility's pricing algorithms, cost-plus formulas, discount

20

matrices, margin-target structures, bid strategies, and commercial-terms templates used in its proposal and quotation systems for U.S. OEM lighting programs, and bids submitted to OEMs.

**C.      OPmobility and Marelli Compete in a Cutthroat Automotive Lighting Industry**

76.      Critically, as shown above, Mr. Favre enjoyed a deep familiarity with OPmobility's strategic plan for 2026-2030.  That plan, which is in the early stages of execution, identifies specific acquisition targets in the global automotive lighting market, includes confidential assessments of competitive positioning against named competitors, and charts OPmobility's roadmap for maintaining and extending its market leadership through the end of this decade.

77.      One of the companies specifically addressed by OPmobility's strategic plan is Marelli—the very same company that now seeks to install Mr. Favre as its CEO.

78.      OPmobility and Marelli are direct competitors in the "Tier 1" automotive lighting industry.

79.      "Tier 1" automotive suppliers design, engineer, and produce major automotive components and provide them directly to car manufacturers, or OEMs.

80.      Automotive lighting is a highly specialized segment within this global automotive components industry.  OEMs outsource the manufacture of substantially all their lighting components, such as headlamps, taillights, daytime running lamps, fog lamps, and signal lamps, to a small group of global Tier 1 suppliers.  Thus, the leading Tier 1 automotive lighting suppliers—including OPmobility and Marelli—compete on a program-by-program (or in plain language, model-by-model) basis for multi-year sourcing awards under which they design, engineer, tool, manufacture, and deliver lighting systems for specific vehicle platforms over product lifecycles that typically extend from initial engineering nomination through the end of production.

81.     In the automotive lighting segment, Tier 1 suppliers typically compete for five-to-six-year contracts to provide the lighting components for a particular iteration of a given vehicle model.   Before the contract period has lapsed, the OEM in question will revisit what lighting components to use on the next iteration of the same car model, and once again request bids from Tier 1 suppliers for the next iteration of the model.

82.     This bidding process is not synchronized across OEMs or the various vehicles that the same OEM produces.  As a result, Tier 1 suppliers are constantly formulating and submitting new bids as bidding cycles open.  The nature of this process means that the loss of a bid is significant, because a Tier 1 supplier not selected to manufacture the component has no opportunity to re-bid for the relevant contract for another five or six years.  By the same token, the Tier 1 supplier who won the bid is only guaranteed to remain the supplier of that component for the term of the contract.  In other words, it will have to compete for a particular model even after winning the bid.

83.     The intensely competitive nature of the automotive lighting industry is further heightened by the fact that bids are typically administered on a "blind" basis.  In other words, Tier 1 suppliers bidding on a contract do not know which of their competitors seek to bid for the very same contract, nor do they know the bids' terms.  A Tier 1 supplier must make an informed guess about who else it may be competing with for a given contract, and how its bid will compare to its competitors'. Unsurprisingly, this results in suppliers offering their automotive lighting components on the most aggressive terms possible.  This fierce pricing competition is exacerbated by the high expenditure and low-profit-margin nature of the automotive lighting business, which results from the fact that suppliers must deeply invest in product development and production at the front end (*i.e.*, pre-bid), with no way to recoup those sunk costs should the supplier ultimately

not win the bid.  As a result, if a company knew a competitor's economics and strategy—such as its pricing, costs, and margin, along with which vehicle models the competitor is targeting and its strategy for winning bids—that would provide an enormous advantage in the bid process, allowing the company to maximize the likelihood of winning a bid while at the same time garnering the highest possible profits from the contract.

84.    Geographically, OPmobility and Marelli vigorously compete to provide automotive lighting components to vehicles sold in, among other markets, North America and Europe; accordingly, they directly compete for business from many (if not all) of the same OEMs that sell cars within those markets.  By way of example, both companies supply automotive lighting products to Stellantis, Volkswagen, BMW, and Mercedes Benz.

85.    The two companies not only compete with each other at the OEM level, they often bid to supply lighting components on the exact same car model.  Indeed, OPmobility and Marelli currently have competing bids pending to provide the lighting components for several models.

86.    The longstanding competition between OPmobility and Marelli is demonstrated by the fact that in February 2024, OPmobility was approached regarding the potential acquisition of Marelli: not as a way to break into the automotive lighting business, as OPmobility had been competing in that space since 2022, but instead as a means of expanding OPmobility's already-existing lighting operations.

### D.    *OPmobility Undertakes Substantial Efforts To Protect its Trade Secrets*

87.    OPmobility takes pains to ensure that non-public company information remains confidential.  In addition to requiring that employees like Mr. Favre agree to confidentiality and

non-competition obligations as part of their employment contracts, OPmobility takes a number of further steps to maintain the secrecy of confidential company information.

88.    By way of example, OPmobility maintains a comprehensive Information Protection and Classification Policy that requires employees to designate company information and information provided to OPmobility by third parties as one of four levels of classification, from "C1" to "C4."  Information is classified based on the degree of restriction OPmobility believes necessary to impose on the information.  Information designated C1 is information that OPmobility intends to make public, while information designated as C2, C3, or C4 must be treated as confidential, is not for public distribution, and cannot be disclosed to unauthorized parties.  This tiered approach reflects OPmobility's carefully calibrated balance between the degree of protection required due to the sensitivity of the underlying information, and the degree of access needed by employees who use that information to perform their job functions.

89.    The Information Protection and Classification Policy also directs employees to apply labels to confidential documents according to the documents' classification, in order to make clear the restricted nature of the information contained therein.  For example, documents designated C2, C3, and C4 are respectively labeled as "Confidential – Internal," "Confidential – Controlled," or "Confidential – Restricted," with these labels often appearing on each page of the document.  These labels indicate to employees that they cannot share the information publicly or otherwise disclose the information without authorization, and assist in policing and correcting inevitable mistakes by putting unauthorized recipients on notice that they have received confidential data to which they should not be privy.  In addition to these specific labels, OPmobility employees may signal that a document is confidential by using additional or similar markings,

such as headers, footers, watermarks, or other indicators that state a document is "Strictly Confidential" or "Internal/Confidential."

90.     Further, OPmobility maintains a Charte Numerique (the "<u>Digital Charter</u>") to regulate employees' use of OPmobility's IT systems and other digital resources, including OPmobility computers, laptops, tablets, other devices, software, applications, systems, telephones, email, messaging apps, and networks.  Among other things, the Digital Charter directs OPmobility employees that they cannot:

     a.    Download, store, publish, distribute, or disseminate information, images, or videos that harm OPmobility integrity, confidentiality, or data security;

     b.    Use OPmobility resources in a manner that violates any applicable laws, including those governing disclosure of financial information, intellectual property, and proprietary information;

     c.    Access, use, or disclose confidential information without authorization;

     d.    Compromise, block, and/or circumvent the technical controls that OPmobility has put in place to prevent and respond to security threats;

     e.    Alter data or attempt to access information to which they are not authorized; and

     f.    Transfer business information to their personal email accounts.

91.     OPmobility's Digital Charter further directs employees that they can only store company data on OPmobility devices and systems, and it requires that all such devices be protected with passwords, tokens, and PINs as applicable.

92.     To ensure OPmobility employees comply with the Digital Charter, OPmobility utilizes monitoring software installed on all company computers, laptops, and networks so that the company may (in compliance with applicable data privacy laws) monitor traffic and activity on these devices and networks.  OPmobility further limits internal access to certain confidential

company information by using technical access controls, such as firewalls that only allow authorized employees to access company assets such as servers.

93.     In addition, OPmobility maintains a Mobile Device Management Policy to regulate employees' use of mobile devices.  Under the Mobile Device Management Policy, OPmobility employees generally can only access company data on a device enrolled in OPmobility's Mobile Device Management ("MDM") system so that the device can be remotely monitored by OPmobility's IT department in compliance with applicable data privacy laws.  OPmobility IT can also remotely lock or wipe a device on the MDM system as needed.

94.     As another example, OPmobility protects its confidential information through the use of NDAs or confidentiality agreements when pursuing potential mergers, acquisitions, or joint ventures.  The company requires all potential merger and acquisition targets to sign a NDA  or confidentiality agreement.  OPmobility may also require company employees working on a potential merger, acquisition, or joint venture to execute an internal NDA specific to the project.

95.     To protect the most sensitive information that might be disclosed in the course of a potential M&A deal, such as commercial privileged information, OPmobility utilizes "clean teams": a group of external third parties (i.e., parties not on either side of an M&A deal) and non-operational employees who act as a "black box" to receive sensitive commercial information disclosed by OPmobility and other parties to an M&A deal.  The clean team then generally provides that information to decisionmakers at an appropriately aggregated or high-level form.

96.     These are merely some, but not all, of the steps OPmobility takes to ensure that its sensitive, proprietary, and trade secret information is kept confidential.

### E.   OPmobility Repeatedly Advised the Defendants of the Threat of Trade Secret Misappropriation and Mr. Favre's Non-Competition Obligations

97.   Less than four months after Mr. Favre left OPmobility, Grégoire Paepegaey, Defendant SVP's managing director, contacted OPmobility because SVP, in its role as the leader of the Ad Hoc Group, was considering the possibility of employing Mr. Favre as Marelli's CEO.

98.   Specifically, on or about February 26, 2026, Mr. Paepegaey contacted OPmobility to request a meeting with Laurent Burelle and Félicie Burelle.  Mr. Paepegaey indicated that the "matter [to be discussed] is somewhat urgent," and that "the discussion will be less useful if it does not take place, ideally, in the first half of next week."  Mr. Paepegaey advised that he was willing to travel to Paris for the meeting and requested "the first available date for Mr. and Mrs. Burelle."

99.   On March 2, 2026, Laurent Burelle and Mr. Paepegaey spoke briefly by phone. During that conversation, Mr. Paepegaey informed Mr. Burelle that SVP was considering hiring Mr. Favre as the CEO of Marelli.  Mr. Burelle spoke with Mr. Paepegaey again on March 3, 2026, informing Mr. Paepegaey of Mr. Favre's Non-Competition Provision, that OPmobility intended to enforce it, and that OPmobility would not permit any Marelli-affiliated entity to hire Mr. Favre.

100.   That same day, OPmobility emailed Mr. Paepegaey and reiterated that Mr. Favre "*is bound by a non-compete clause, for which OPmobility compensates him, and which prohibits him from joining, working for, or acquiring any interest in a company that is in competition with OPmobility in terms of parts or services*."

101.   Mr. Paepegaey responded, expressing the opinion that the Non-Competition Provision might be inapplicable.

102.   To protect its rights and to avoid any confusion, OPmobility (through its counsel) sent further correspondence to SVP, Marelli, *and* to Mr. Favre, directly setting forth its position. For instance, on March 13, 2026, OPmobility's counsel wrote to Marelli and SVP, and recounted

the prior discussions in which SVP indicated that Mr. Favre was about to be recruited to serve as Marelli's global CEO, in violation of the Non-Competition Provision. OPmobility again warned that the Defendants' recruitment of Mr. Favre was impossible given Mr. Favre's awareness of all of OPmobility's business secrets and the Non-Competition Provision, and explicitly notified the Defendants that they were prohibited from hiring, or allowing the hiring, of Mr. Favre. In that letter, OPmobility reinforced the importance of protecting its trade secrets, advising the Defendants that OPmobility would have no choice but to take any and all necessary legal action should the Defendants' proceed with their plan, including pursuing any resulting commercial and industrial damages. OPmobility reminded the Defendants that Mr. Favre "*was the Managing Director of OPmobility at the time of the acquisition of OPmobility's lighting business, that he is familiar with its strategy, contracts, customers, and pricing structures, and that, consequently, in addition to the reputational harm and potential anti-competitive harm resulting from this hiring, such harm could extend to the entire OPmobility lighting business*."

103. Undeterred, the Defendants continued to pursue Mr. Favre and the trade secrets he possesses, and sought to induce him to violate the Non-Competition Provision.

104. For example, on March 16, 2026, counsel for Marelli responded to OPmobility's March 13, 2026 letter and cc'd Mr. Paepegaey, others at SVP, and SVP's counsel. The letter stated, in relevant part:

> *First of all, we wish to clarify that the company SVP is, to date, neither an owner, nor a shareholder, nor a subsidiary of Marelli, nor does it control it in any way whatsoever. It follows that the representatives of SVP, and in particular, Mr. Grégoire Paepegaey, cannot be regarded as representatives of Marelli.*
>
> *Secondly, the allegations concerning the ties between Marelli and Mr. Favre are unfounded. Mr. Favre has not been hired by Marelli and is bound neither by an employment contract nor by an offer letter nor, more broadly, any contractual commitment with Marelli.*

28

> *In any event, Marelli disputes your analysis that the non-compete clause stipulated in Mr. Favre's employment contract would, in itself, act as an obstacle to the individual potentially being hired by Marelli or would be such as to constitute harm to the detriment of OPmobility.*

Marelli concluded by acknowledging the importance of confidentiality obligations placed upon its employees and asserting that Mr. Favre had not disclosed any of OPmobility's confidential, sensitive, technical, commercial, industrial, or financial plans.

105.    On March 19, 2026, counsel for SVP wrote to OPmobility and self-servingly asserted that OPmobility would not suffer any loss if Mr. Favre "were recruited by Marelli."

106.    On March 22, 2026, OPmobility's counsel reiterated to SVP and Marelli that Mr. Favre was bound by the Non-Competition Provision, and that it was "*inconceivable that this clause should not be complied with, Mr. Favre's duties as CEO within OPmobility having granted him the broadest access to all confidential and strategic information and to the trade secrets of the OPmobility Group,*" and that the pursuit of Mr. Favre strongly suggested that SVP and Marelli "*are not interested in Mr. Favre's professional qualities—which are comparable to those of many other candidates—but rather in the information he possesses; this targeted recruitment is nothing more than an unfair maneuver to destabilize a competitor, in violation of a non-compete obligation that Mr. Favre entered into and subsequently enforced with great rigor within the company.*"

107.    On April 10, 2026, OPmobility's U.S. counsel sent a letter to Marelli's outside counsel and Marelli's Executive Vice President and Chief Legal Officer, and cc'd SVP.  In that letter, OPmobility again provided the text of Mr. Favre's valid Non-Competition Provision and described the serious harm that Mr. Favre's hiring posed to OPmobility.  Quoting the language of the Confidentiality and Non-Competition Provisions of Mr. Favre's Employment Contract, counsel noted that:

29

> For over five years, Mr. Favre had unfettered access to the entirety of OPmobility's worldwide businesses. Mr. Favre had responsibility for, and gained a deep understanding of, OPmobility's technical, commercial, industrial, marketing, strategic, and financial confidential information and trade secrets, including those directly concerning OPmobility's lighting product businesses. Mr. Favre's duties encompassed responsibility for all OPmobility activities in the United States. Among other things, he was directly involved in strategic acquisitions, including in the U.S. markets, oversaw critical client development efforts in the U.S., and oversaw OPmobility's marketing strategy. He undoubtedly maintains a deep knowledge of OPmobility's U.S-based commercial proposals, pricing, and profit structure, among other matters.

> \*\*\*

> The OPmobility trade secrets in Mr. Favre's possession are the result of years of investment and business development by the company and central to its competitive position in the multibillion-dollar lighting market. Any potential disclosure to a competitor would be taken as an enterprise-threatening risk.

OPmobility therefore requested that Marelli confirm: whether (a) it is proceeding with the hiring of Mr. Favre; (b) it has received any confidential information or trade secrets from him; (c) it will refrain from any action that threatens their confidentiality; and (d) it will otherwise ensure that it, and all persons acting on its behalf, will refrain from actions that would constitute misappropriation of trade secrets. OPmobility informed Marelli that if it did not cease its pursuit of Mr. Favre, OPmobility would be left with no choice other than to enforce its rights in court.

108. Just three days later, on April 13, 2026, Marelli issued a press release titled "Marelli Announces Leadership Appointments" announcing a number of new appointments, including an "Interim Chief Executive Officer." The press release also touted Mr. Favre's planned employment with Marelli, stating that the Ad Hoc Group had "separately" "announced their plan to appoint Laurent Favre as Marelli's future Chief Executive Officer." The press release did not include a planned date of appointment and only stated Mr. Favre would assume this role "at the conclusion of [Frederick A. "Fritz"] Henderson's tenure as Interim Chief Executive Officer."

30

109. The Ad Hoc Group's press release was explicit: "Ad Hoc Group of Marelli Lenders Announces Plan to Appoint Laurent Favre as Future Company CEO." The press release stated, in pertinent part, that:

> The Ad Hoc Group of lenders to Marelli, a global mobility technology supplier to the automotive industry, today announced that they intend to appoint Laurent Favre as the company's future Chief Executive Officer. Mr. Favre will work closely with the Ad Hoc Group to support Marelli's ongoing restructuring and strategic planning, and plans to take over in due course from Interim CEO Frederick A. "Fritz" Henderson.
>
> ***
>
> Mr. Favre most recently served as CEO of OPmobility, a leading Tier 1 automotive supplier, where he led a complex global transformation, delivering profitable growth and strong cash generation. He brings more than 20 years of automotive industry experience, with a strong track record of operational improvement, financial performance, and deep OEM partnerships.
>
> ***
>
> A spokesperson for the Ad Hoc Group said: 'We are excited to announce our plan to appoint Laurent Favre as Marelli's future CEO. . . Laurent is a highly regarded industry leader with the operational and strategic expertise required to guide Marelli for long-term success.'
>
> ***
>
> Mr. Favre said: 'Marelli is distinguished by its strong technology, global footprint and long-standing customer relationships. I look forward to working closely with the OEMs and the full Marelli team to refine the company's strategic roadmap and support a successful emergence from Chapter 11.'

110. The press releases confirmed OPmobility's fears. Notwithstanding OPmobility's attempt to avoid litigation by issuing repeated warnings that it would enforce its rights, Marelli and SVP were working to recruit Mr. Favre and inducing the breach of his obligations to OPmobility. And, as OPmobility suspected, this announcement homed in on why the Defendants

targeted Mr. Favre for the CEO position at Marelli—his work "as CEO of OPmobility, a leading Tier 1 automotive supplier, where he led a complex global transformation, delivering profitable growth and strong cash generation." In other words, the exact confidential information and expertise Mr. Favre gained from OPmobility was the driving force behind the Defendants' decision to induce him to breach his obligations.

111.   Nor can OPmobility derive any comfort in the notion that Mr. Favre will assume the CEO position at Marelli at some undefined point in the future: the Ad Hoc Group's announcement demonstrates that Mr. Favre is expected to work "closely" with the Ad Hoc Group "to support Marelli's *ongoing* restructuring and strategic planning." (emphasis added). Thus, by its own admission, the Ad Hoc Group—Marelli's biggest creditors, and the very same group that intends to assume control over Marelli's operations if Marelli is able to exit Chapter 11—is collaborating with Mr. Favre now, to provide support and assistance in Marelli's restructuring and strategic planning.

112.   On the same day the Marelli and Ad Hoc Group's press releases were issued, Mr. Favre instituted a proceeding in the Nanterre Labor Court Interim Proceedings Division against OPmobility. In that action, Mr. Favre stated: *"Mr. Favre was approached by the investment fund STRATEGIC VALUE PARTNERS (hereinafter 'SVP'), which, as part of a potential takeover of the MARELLI Group (hereinafter 'MARELLI'), currently under Chapter 11 US bankruptcy protection, is considering hiring him to take on the role of Global CEO of the MARELLI Group."* Mr. Favre expressly noted that Marelli *"is a long-standing global player in the automotive industry, whose business is primarily focused on the manufacture of lighting systems, alternators, batteries, coils, and other electrical components"* and that he had *"expressed interest in this search."* Mr. Favre described himself as *"a globally renowned figure in the automotive industry,"*

32

which was why *"he was approached by the SVP investment fund and MARELLI"*; he also explained that the automotive industry is *"one of the most complex business sectors in existence, which is being impacted by the challenges of an unprecedented, global technological transformation."*

113.    The very next day, April 14, 2026, Marelli's counsel sent a letter to OPmobility, alleging that: (i) it had received no OPmobility confidential information from Mr. Favre, (ii) it had no intention of obtaining any such information from Mr. Favre, and (iii) no one "with authority to bind Marelli ha[d] entered into an employment relationship with Mr. Favre and none of those individuals have a present intention to do so."

114.    As noted above, however, SVP—which describes itself as having "control or significant influence" over the distressed businesses to which it lends credit—announced that Mr. Favre would be Marelli's forthcoming CEO.

115.    On May 22, 2026, OPmobility's U.S. counsel again wrote to Marelli and SVP. OPmobility noted the tension between the Defendants' statements that Marelli had no relationship with Mr. Favre and the April 13, 2026 press releases.  OPmobility also noted that those statements were inconsistent with reports OPmobility received that Mr. Favre had been contacting OPmobility's clients.  In light of SVP's stated plan to hire Mr. Favre as CEO for Marelli notwithstanding the Non-Competition Provision, OPmobility served the Defendants with a document preservation notice, as it appeared that OPmobility would be forced to institute litigation to protect its trade secrets and enforce its contractual rights.

116.    On June 3, 2026, counsel for Marelli responded, asserting that "Marelli has not entered into an employment relationship with Mr. Favre.  And, to be clear, the statement you reference regarding a 'plan to appoint Laurent Favre as Marelli's future Chief Executive Officer'

was made by an ad hoc group of lenders to Marelli—not Marelli. Moreover, as previously stated, Marelli has not received any OPmobility confidential information from Mr. Favre and has no intention of obtaining any such information from Mr. Favre."

**F.    *Due to the Defendants' Actual and Threatened Misappropriation of OPmobility's Trade Secrets and Their Refusal to Recognize OPmobility's Rights, OPmobility Has No Option Left but To Pursue Legal Action***

117.    Upon information and belief, OPmobility's trade secrets are already being misappropriated, and Mr. Favre's contractual and fiduciary obligations breached. Upon information and belief, in May of 2026 Mr. Favre was actively holding himself out as working on Marelli's behalf, including by meeting with current or potential customers of Marelli and OPmobility, engaging with shareholders, and visiting Marelli plants. Upon information and belief, Mr. Favre also met with OPmobility's banking partners in support of his anticipated role with Marelli. This, coupled with the Ad Hoc Group's public announcement that Mr. Favre would be "work[ing] closely with the Ad Hoc Group to support Marelli's ongoing restructuring and strategic planning," demonstrates that Mr. Favre is already working on behalf of OPmobility's direct competitor, and engaging with the same customer base he served at OPmobility. Thus, the misappropriation OPmobility feared is not merely threatened—it has already begun.

118.    The serious and irreparable harm suffered by OPmobility will only grow once Mr. Favre formally assumes officially the role of Marelli's CEO. Mr. Favre will then oversee Marelli's worldwide operations, including its U.S. automotive lighting business—which means he will be working to position Marelli to outcompete OPmobility in the same U.S. market, in the same business segment, with the same OEM customers, having just had full access to OPmobility's strategy, pricing, and competitive intelligence. There is no way Mr. Favre could lead a direct

competitor's global operations in the same product segment without drawing on the trade secrets he acquired at OPmobility.

119.    Absent court intervention, the harms to OPmobility will only multiply as Mr. Favre's actions continue.  Its competitive position in a multibillion-dollar market risks being irreversibly compromised if Mr. Favre is permitted to formally assume the CEO role that SVP, the Ad Hoc Group, and Marelli have already bequeathed upon him in substance.

## CAUSES OF ACTION
## COUNT ONE: MISAPPROPRIATION OF TRADE SECRETS
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)

120.    OPmobility repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

121.    The federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. (the "DTSA") provides a civil cause of action for the misappropriation of trade secrets.

122.    As set forth above, the Defendants have improperly and without OPmobility's consent accessed, acquired, remained in possession of, used, and/or disclosed certain confidential and proprietary information of OPmobility constituting "trade secrets" as defined by 18 U.S.C. § 1839(3), and have threatened to do so.  These trade secrets, as described above, are related to a product or service that is used in, has been used in, and/or is intended for use in interstate and/or foreign commerce.  OPmobility is the owner of such information.

123.    This information is central to OPmobility's business strategies and operations, especially with respect to the automotive lighting market segment.  This information reflects, to some degree, OPmobility's accumulated experience in the lighting industry and embodies the company's business plans, strategies, innovations, outlook, product plans, and analyses of the

market both as they exist right now and will for the ensuing years.  It is, in short, the kind of information direct competitors expend considerable resources attempting to glean imperfectly from publicly available information and/or through extensive investment in market research and intelligence initiatives.  It is the kind of highly actionable competitive intelligence that can be directly deployed to the Defendants' advantage—and to harm OPmobility.

124.    OPmobility has taken numerous, reasonable precautions to protect and to maintain the value of its trade secrets.  Mr. Favre and OPmobility employees are subject to obligations to maintain the confidentiality of OPmobility's trade secrets, including pursuant to employee contracts containing confidentiality provisions.  OPmobility also maintains a comprehensive Information Protection and Classification Policy that requires employees to designate confidential company information and confidential information provided to OPmobility as confidential and not for public distribution or disclosed to unauthorized parties.  The Information Protection and Classification Policy also directs employees to apply labels to confidential documents, both to indicate to employees that they cannot share the information publicly or otherwise disclose the information without authorization, and to make unauthorized recipients aware that they have received confidential data.  OPmobility employees may also signal that a document is confidential by using additional or similar markings, such as headers, footers, watermarks, or other indicators. OPmobility also maintains policies that regulate employee use of OPmobility devices and networks and utilizes monitoring software installed on all company computers, laptops, and networks so that the company may (in compliance with applicable data privacy laws) monitor traffic and activity on these devices and networks.

125.    OPmobility's trade secrets derive actual or potential independent economic value by virtue of the fact that these trade secrets are not known or readily ascertainable through proper

means by any other person who can obtain economic value from the disclosure or use of the information.

126. OPmobility's trade secrets are not accessible to the public and are not generally known within the trade or by persons who are skilled in the trade, other than by those who are bound to maintain its secrecy and confidentiality.

127. The Defendants have accessed, threaten to access, and both used and threaten to use OPmobility's trade secrets without express or implied consent from OPmobility, while knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets, in violation of the DTSA.

128. As a result of the Defendants' above-described misappropriation and threatened misappropriation, OPmobility has been harmed, including by enabling the Defendants to improve Marelli's ability to compete with OPmobility to win customers by using improperly obtained OPmobility information to inform SVP and the Ad Hoc Group's restructuring plans for Marelli, and Marelli's strategic planning, including strategies targeted to specific geographic markets; customer-specific strategy plans; and pricing strategies, and to otherwise unfairly gain a competitive advantage. As a direct and proximate result of the Defendants' unlawful, tortious conduct, OPmobility has been and will be damaged and the Defendants have been unjustly enriched. The damage to OPmobility includes, among other things, the actual or threatened acquisition or use of the trade secrets alleged above, and harm to OPmobility's ability to compete with Marelli and other automotive companies as a result of the Defendants' actual or threatened misappropriation. OPmobility's loss of customers due to the Defendants' misappropriation is and would be irreparable. The unjust enrichment includes the profits the Defendants have obtained

and may in the future obtain through their misappropriation of the trade secrets and the value attributed to the misappropriated information.

129.    The Defendants' conduct constitutes willful and malicious misappropriation within the meaning of the DTSA.  In wrongfully and intentionally misappropriating OPmobility's trade secrets, as outlined above, the Defendants have demonstrated specific intent to cause substantial injury or harm to OPmobility.  As such, OPmobility is entitled to an award of exemplary damages as well as an award of its reasonable attorneys' fees pursuant to the DTSA.

130.    Unless the Defendants are enjoined from misappropriating OPmobility's trade secrets, OPmobility will suffer irreparable harm for which there is no adequate remedy at law.

### COUNT TWO: MISAPPROPRIATION OF TRADE SECRETS

### (Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001 *et seq*.)

131.    OPmobility repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

132.    The Delaware Uniform Trade Secrets Act ("DUTSA"), 6 Del. C. § 2001 *et seq.*, provides a civil cause of action for the misappropriation of trade secrets.

133.    As set forth above, the Defendants have improperly and without OPmobility's consent accessed, acquired, remained in possession of, used, and/or disclosed certain confidential and proprietary information of OPmobility constituting "trade secrets" within the meaning of DUTSA, and have threatened to do so.  OPmobility's trade secrets constitute information that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of reasonable efforts to maintain its secrecy. 6 Del. C. § 2001(4)(a)–(b).

134. The existence and independent economic value of OPmobility's trade secrets, and OPmobility's reasonable efforts to protect their secrecy, are as alleged in the First Cause of Action above and in the factual allegations, which are incorporated herein by reference.

135. In addition, given the trade secrets Mr. Favre was privy to in the course of his employment at OPmobility, Mr. Favre cannot work for a competitor of OPmobility, like Marelli, in the same or similar position without inevitably calling upon and disclosing OPmobility's trade secrets.

136. As detailed above, the Defendants have accessed, threatened to access, and both used and threaten to use OPmobility's trade secrets without express or implied consent from OPmobility, while knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

137. The Defendants' misconduct as detailed above, including their inducement of Mr. Favre to violate his obligations to OPmobility, constitutes acquisition or use of OPmobility's trade secrets by "improper means" within the meaning of 6 Del. C. §§ 2001(1) and 2001(2)(a).

138. The Defendants' misappropriation and threatened misappropriation is willful and malicious within the meaning of 6 Del. C. § 2003(b), for the same reasons set forth in the First Cause of Action above.

139. As a result of the Defendants' above-described misappropriation and threatened misappropriation, OPmobility has been harmed, including by enabling the Defendants to improve Marelli's ability to compete with OPmobility to win customers by using improperly obtained OPmobility information to inform SVP and the Ad Hoc Group's restructuring plans for Marelli, and Marelli's strategic planning, including strategies targeted to specific geographic markets;

customer-specific strategy plans; and pricing strategies, and to otherwise unfairly gain a competitive advantage. As a direct and proximate result of the Defendants' unlawful, tortious conduct, OPmobility has been and will be damaged and the Defendants have been unjustly enriched. The damage to OPmobility includes, among other things, the actual or threatened acquisition or use of the trade secrets alleged above, and harm to OPmobility's ability to compete with Marelli and other automotive companies as a result of the Defendants' actual or threatened misappropriation. OPmobility's loss of customers due to the Defendants' misappropriation is and would be irreparable. The unjust enrichment includes the profits the Defendants have obtained and may in the future obtain through their misappropriation of the trade secrets and the value attributed to the misappropriated information.

140. Unless the Defendants are enjoined from misappropriating OPmobility's trade secrets, OPmobility will suffer irreparable harm for which there is no adequate remedy at law.

## COUNT THREE: TORTIOUS INTERFERENCE WITH CONTRACT

141. OPmobility repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

142. The Employment Contract between OPmobility and Mr. Favre is a valid and binding legal contract, including the Confidentiality Provision and the Non-Competition Provision set forth therein.

143. By agreeing to collaborate or work with the Defendants—in whatever capacity, whether paid or unpaid, formal or informal—as reflected in the Ad Hoc Group's press release, "to support Marelli's ongoing restructuring and strategic planning," with the goal of helping Marelli compete with OPmobility, Mr. Favre breached his Employment Contract, including the Confidentiality Provision and the Non-Competition Provision.

144. At least by virtue of the correspondence sent on OPmobility's behalf to the Defendants, the Defendants were aware of the Confidentiality Provision and Non-Competition Provision of Mr. Favre's Employment Contract.

145. Despite this knowledge, the Defendants intentionally and without justification or excuse have sought to interfere with the Confidentiality and Non-Competition Provisions of the Employment Contract by having pursued, and by continuing to pursue, Mr. Favre for the role of Marelli's future CEO, and by working "closely" with Mr. Favre in support of Marelli's ongoing restructuring and strategic planning, as demonstrated by, among other things:

    a. the Defendants' public announcements to that effect;

    b. Mr. Favre's outreach to current or former OPmobility customers in support of his anticipated role with Marelli; and

    c. Mr. Favre's meeting with OPmobility banking partners in support of his anticipated role with Marelli.

146. The Defendants' intentional acts, in which they engaged without justification, were a significant factor in causing Mr. Favre to breach his Employment Contract.

147. The Defendants' tortious interference with the Confidentiality and Non-Competition Provisions of Mr. Favre's Employment Contract with OPmobility are causing OPmobility irreparable harm, and will continue to cause OPmobility irreparable harm unless and until the Defendants' conduct is enjoined by the Court.

148. Moreover, as a result of the Defendants' tortious interference with Mr. Favre's Employment Contract, OPmobility has suffered monetary damages and will continue to be damaged by the Defendants' actions, as described above. In addition, OPmobility has been and will be damaged and the Defendants have been unjustly enriched. The unjust enrichment includes

the profits the Defendants have obtained and may in the future obtain through their misappropriation of the trade secrets and the value attributed to the misappropriated information.

149.   Accordingly, OPmobility is entitled to the recovery of such damages in amounts to be established at trial.

**COUNT FOUR: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

150.   OPmobility repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

151.   As CEO of OPmobility, President and Director of OPmobility Delaware, and his other roles within OPmobility Group, Mr. Favre owed a continuing fiduciary duty of loyalty to OPmobility Delaware at all times while he was employed by OPmobility up to, and continuing after, his departure.  Specifically, Mr. Favre had, and has, an ongoing duty of loyalty not to use OPmobility's property, including its confidential information, for his own purposes or those of a third party (like the Defendants) and to not disclose OPmobility's confidential information for his own purposes or those of a third party (like the Defendants).  This ongoing duty of loyalty applies regardless of whether the property and confidential information is contained in a physical record or in Mr. Favre's memory.

152.   By the acts described herein, Mr. Favre breached that fiduciary duty by, among other things, using and disclosing OPmobility's confidential trade secrets for his and the Defendants' own purposes.

153.   The Defendants had actual knowledge that Mr. Favre owed a fiduciary duty to OPmobility Group and OPmobility Delaware.

154.   Upon information and belief, the Defendants, with knowledge of Mr. Favre's breach of his fiduciary duty owed to OPmobility Delaware and OPmobility Group,  actively and

knowingly participated in, facilitated, and provided significant aid to, those breaches by, among other things: (1) recruiting Mr. Favre to serve as CEO of the restructured Marelli, knowing that he possessed and would use OPmobility's confidential information; (2) soliciting and receiving Mr. Favre's assistance, input, analysis, and advice regarding Marelli's restructuring and operations, which incorporates and is based on OPmobility's confidential information; and (3) encouraging, allowing, or directing Mr. Favre to conduct outreach on behalf of Marelli to OPmobility customers and banking partners using confidential information he had obtained from OPmobility.

155.   The Defendants' aiding and abetting of Mr. Favre's breach of his fiduciary duty is causing OPmobility irreparable harm, and will continue to cause OPmobility irreparable harm unless and until the Defendants' conduct is enjoined by the Court.

156.   In addition, OPmobility has been and will be damaged and the Defendants have been unjustly enriched. The unjust enrichment includes the profits the Defendants have obtained and may in the future obtain through Mr. Favre's use and disclosure of OPmobility's confidential information and the value attributed to the confidential information.

157.   As a result of the Defendants' aiding and abetting Mr. Favre's breach of his fiduciary duty to OPmobility, OPmobility has been damaged in amounts to be proved at trial and is entitled to other equitable relief not available at law.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully pray for entry of judgment against the Defendants and enter the following relief:

A.   Preliminary and permanent injunctive relief enjoining the Defendants, and each of their respective agents, servants, employees, attorneys, representatives, and all others acting on their behalf or in concert with them:

1. From employing Mr. Favre in the same or similar position to his role at OPmobility, or from employing Mr. Favre in any position that would result in him competing with OPmobility, including in the automotive lighting industry, for a period not earlier than the period provided in the Non-Competition Provision;

2. From allowing Mr. Favre to operate on behalf of Marelli in support of Marelli's lighting operations;

3. From allowing Mr. Favre to operate on behalf of Marelli in support of Marelli's lighting business group;

4. From eliciting or from benefitting in any way from OPmobility's trade secret information;

5. From allowing Mr. Favre to work with the Ad Hoc Group to support Marelli's ongoing restructuring and strategic planning;

6. From any further misappropriation, acquisition, possession, access, use, or disclosure of OPmobility's trade secrets;

7. From any further participation in Mr. Favre's breach of the fiduciary duties owed to OPmobility;

8. To return and/or destroy all of OPmobility's trade secrets, any record or reflection thereof, and any information derived in whole or in part thereof;

9. To place appropriate restrictions on personnel who have been exposed to any of OPmobility's trade secrets or information derived therefrom, including any involvement in the automotive lighting industry; and

10.   Any other injunctive relief deemed appropriate by the Court to address the risk that Mr. Favre discloses OPmobility's highly sensitive commercial information to or for the benefit of the Defendants;

B.   Damages in an amount to be proven at trial, including but not limited to the Defendants' unjust enrichment, OPmobility's actual losses or lost profits, a reasonable royalty, and/or exemplary or punitive damages;

C.   An order requiring the Defendants to account for all gains, profits, and advantages derived from their misappropriation of OPmobility's trade secrets;

D.   Disgorgement of any profits derived from the Defendants' misappropriation of OPmobility's trade secrets and aiding and abetting of breach of fiduciary duty;

E.   Restitution;

F.   Pre-judgment and post-judgment interest;

G.   Costs of suit;

H.   Reasonable attorneys' fees and costs incurred in prosecuting this action; and

I.   Such other and further relief as the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiffs demand a trial by jury on all claims so triable.  The Plaintiffs do not consent to a jury trial conducted by a bankruptcy judge.

Dated: June 16, 2026
      Wilmington, Delaware

Respectfully submitted,

*/s/ Jacob R. Kirkham*
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
Danielle Bateman (*pro hac vice* pending)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com
danielle.bateman@kobrekim.com

-and-

Michael Ng (*pro hac vice* pending)
Daniel A. Zaheer (*pro hac vice* pending)
150 California Street, 19th Floor
San Francisco, CA 94111
Telephone: (415) 582-4800
Facsimile: (415) 582-4811
michael.ng@kobrekim.com
daniel.zaheer@kobrekim.com

-and-

Adam M. Lavine (*pro hac vice* pending)
George Stamatopoulos (*pro hac vice* pending)
Jessica K. Fender (*pro hac vice* pending)
Zachary Sizemore (*pro hac vice* pending)
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com
george.stamatopoulos@kobrekim.com
jessica.fender@kobrekim.com
zachary.sizemore@kobrekim.com

*Attorneys for Plaintiffs OPmobility Gestion;*
*OPmobility SE; OPmobility Holding USA, Inc.; and*
*OPmobility Lighting Holding.*

46